NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-983

ERIC MADONNA

vs.

MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION & another.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Eric Madonna, filed a complaint with the Massachusetts Commission Against Discrimination (MCAD or commission), alleging that his former employer, the Fall River Police Department (FRPD), unlawfully denied him certain employment opportunities because of his posttraumatic stress disorder (PTSD) diagnosis.  MCAD dismissed the complaint, and Madonna sought judicial review in Superior Court.  A judge dismissed that complaint, and Madonna now appeals.  He argues that MCAD erred in failing to apply the framework adopted in Gannon v. Boston, 476 Mass. 786 (2017), when determining whether the FRPD unlawfully denied him details and overtime shifts.  We conclude that MCAD's decision did not adequately address

_____

[1] Fall River Police Department.

Madonna's arguments, and we vacate the judgment and remand the matter to MCAD for reconsideration.

Factual background. We summarize the relevant portions of the hearing officer's findings of fact.

Madonna started working as an officer for the FRPD in 1996 and typically worked night shifts "on the streets." Several years later, he temporarily left his position to serve two tours of duty with the Army in Iraq, but he returned full-time to his job with the FRPD in June 2006. By 2008, Madonna's mental health had declined severely, and he was eventually diagnosed with PTSD. After completing a three-month residential treatment program in November 2008, Madonna sought to return to work with reasonable accommodations that would prevent his PTSD symptoms from worsening. Madonna, his licensed therapist, and the FRPD internal affairs officer agreed that Madonna should be limited to daytime shifts to accommodate the sleep issues caused by his PTSD.

In December 2008, Madonna returned to the FRPD in the newly-created role of evidence custodian. In this position, Madonna worked a regular daytime shift with no weekend or holiday hours. At some point in the weeks following his return, Madonna requested that he be allowed to work details and overtime shifts again. On January 27, 2009, Madonna was informed that he was not eligible for details or overtime shifts

2

due to a department policy making such assignments unavailable to "light duty" officers.

On hearing the news that he would not be permitted to work details, Madonna testified that he became "stressed out," feeling "physically shaken up inside" and like his head "was going to explode." He left in the middle of his shift -- without his supervisor's permission -- to seek an emergency appointment with his therapist. Madonna called in sick the next day due to stress.

Concerned that Madonna might intentionally hurt himself, FRPD Chief John Souza ordered Madonna to turn in his service revolver, personal firearms, police badge, and other related items. This escalated the situation; according to Madonna's therapist, Madonna became "extremely distraught" at being ordered to turn in his weapons. Nevertheless, the therapist told the FRPD that Madonna was "not in danger of harming [him]self or others" at that time. A doctor at a Veterans Administration hospital agreed, after an evaluation on January 29, that Madonna was neither homicidal nor suicidal. Madonna later testified that he was, in fact, suicidal that day, but that he would "never do it [him]self." Madonna never returned to work at the FRPD after the events of January 27 and 28, 2009.

Chief Souza banned Madonna from the police station entirely, and Madonna was put on paid leave pending his expected retirement.[2]

Procedural history.  In September 2009, Madonna filed a complaint with MCAD alleging that the FRPD had discriminated against him due to his PTSD-related disability.  Madonna argued, among other things, that the FRPD unlawfully denied him overtime shifts and details based on the stereotype that his PTSD made him a danger to himself or others.  He suggested that the FRPD should be required to show, by a preponderance of the evidence, that he was not qualified to perform these functions because he posed a "direct threat," and that it reached this conclusion based on "current medical knowledge and/or the best available objective evidence."  Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 85-86 (2002), quoting 29 C.F.R. § 1630.2(r) (2001).

Following a seven-day hearing, the MCAD hearing officer dismissed the complaint.  She found that, while Chief Souza believed in good faith that the policy restricting light-duty officers from working details and overtime shifts applied to Madonna, the Chief was also partially motivated by his "concerns

_____

[2] Madonna was put on paid injury leave under G. L. c. 41, § 111F, for almost four years.  FRPD policy prohibits employees on leave under this section from working for another employer without consent from the Chief, and even then, the employee may not work more than twenty hours per week.  Despite the policy, while on leave, Madonna obtained full-time employment with the Navy, and later with the Department of Homeland Security, without informing or obtaining consent from the FRPD.

4

that paid details and overtime would place [Madonna] in contact with the public and create potential safety issues" due to Madonna's PTSD. Nevertheless, the hearing officer concluded that Chief Souza's concerns were supported by record evidence and were "not unreasonable."

In appealing the dismissal to the full commission, Madonna made two main arguments related to the "direct threat" standard that he articulated to the hearing officer. First, he asserted that the hearing officer failed to assess whether the claimed danger posed by Madonna's PTSD actually rose to the level of a "direct threat" -- defined as a "significant risk of substantial harm to the health or safety of the [employee] or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r) (2022). Second, Madonna argued that the hearing officer improperly deferred to Chief Souza's assessment of the risk, which Madonna asserted was informed by a prejudicial stereotype, instead of requiring the FRPD to show that it made an individualized assessment based on objective medical evidence.

While Madonna's appeal to the commission was pending, the Supreme Judicial Court decided Gannon v. Boston, 476 Mass. 786 (2017). The Gannon decision, in relevant part, confirmed that, in what it termed a "qualified handicapped person" case -- wherein an employer claims that a safety risk stemming from an

5

employee's disability renders the employee unqualified to perform an essential job function -- the employer must come forward with "specific evidence showing that the employee would pose an unacceptably significant risk of serious injury to the employee or others."  Id. at 799.  The employer must also show "that it has made 'an individualized factual inquiry' based on substantial information regarding the employee's individual work and medical history."  Id. at 799-800.  "At trial, the fact finder must determine not whether the [employer] acted on a good faith belief that [the employee] cannot capably perform [a position's full] duties because of his handicap, but whether [the employee] has proved by a preponderance of the evidence that he can do so."  Id. at 797.

The full commission affirmed the decision of the hearing officer in April 2019, reiterating that "Chief Souza's concerns about [Madonna] working with the public and possessing firearms as a result of his PTSD symptoms were legitimate based upon the evidence in the record," and concluding, with little further analysis, that the FRPD's actions were not discriminatory. Despite Madonna's "direct threat" argument, and although the full commission's decision cited the "unacceptably significant risk" standard from Gannon, 476 Mass. at 799, the commission's decision did not apply either standard.  Nor did it address whether the FRPD's evidence was sufficiently objective and

6

reliable, or whether it sufficed to meet the employer's burden of producing evidence showing that a PTSD-related safety risk rendered Madonna unqualified to perform details and overtime shifts. See Gannon, 476 Mass. at 799-800 (employer's burden of production).

Madonna next sought judicial review of MCAD's decision in Superior Court, where he essentially repeated the same arguments he made before the full commission, this time using parts of the framework provided in Gannon in addition to the "direct threat" standard. The judge, however, did not address Madonna's arguments. Instead, he granted summary judgment to MCAD based on what he termed the hearing officer's "implicit[]" finding that the denial of Madonna's request for details and overtime shifts was not an adverse employment action. The judge, quoting Ritchie v. Department of State Police, 60 Mass. App. Ct. 655, 665 (2004), reasoned that the denial did not constitute "a change in working conditions that create[d] a material disadvantage in the plaintiff's employment" (quotation and citation omitted), because Madonna was a light-duty officer and the FRPD's policy prohibited such officers from working overtime shifts and details.[3]

_____

[3] Although we consider the judge's reasoning, it carries no special weight on appeal; our review is de novo. See Smith College v. Massachusetts Comm'n Against Discrimination, 376 Mass. 221, 224 (1978).

Discussion.  On appeal, Madonna asserts that MCAD erred by failing to apply the framework outlined in Gannon.

1.  Waiver.  As a preliminary matter, we reject MCAD's contention that Madonna waived any arguments based on Gannon by failing to raise them before the full commission or Superior Court.  Generally, "[a] party is not entitled to raise arguments on appeal that he could have raised, but did not raise, before the administrative agency . . . [nor] in the court below."  Albert v. Municipal Court of Boston, 388 Mass. 491, 493-494 (1983).  "The inquiry into whether an issue has been raised is fact specific."  Boss v. Leverett, 484 Mass. 553, 563 (2020).  It requires us to determine whether the agency and Superior Court were "fairly put on notice as to the substance of the issue."  Chelsea Hous. Auth. v. McLaughlin, 482 Mass. 579, 584 (2019), quoting Nelson v. Adams USA, Inc., 529 U.S. 460, 469 (2000).

As discussed above, Madonna raised two major arguments before the full commission and Superior Court.  We acknowledge that, in his appellate brief, Madonna has reframed his previous arguments about the "direct threat" standard to use the framework provided in Gannon.  First, instead of asserting that MCAD erred by failing to apply the "direct threat" standard, Madonna now argues that the hearing officer should have considered whether he posed an "unacceptably significant risk."

8

The substance of this argument, however, remains the same: in Madonna's view, MCAD should have assessed whether the evidence showed that he posed a safety risk so significant as to render him unqualified to perform details and overtime shifts. See Gannon, 476 Mass. at 799-800.

Second, and similarly, Madonna now uses the language of Gannon to clarify his earlier argument against the deferential "reasonableness" standard applied by the hearing officer. He now equates the "reasonableness" standard to the "good faith" standard rejected in Gannon. The substance of his argument, however, is still that the hearing officer should have determined not merely whether the FRPD acted without animus or pretext but whether the FRPD's risk assessment was informed and supported by sufficient objective evidence. The employer's good faith is not a defense. See Gannon, 476 Mass. at 796-797.

We also reject MCAD's assertion that Madonna was required to update his briefing to the full commission after Gannon was issued in 2017.[4] As explained, Madonna's brief to the commission provided adequate notice of his arguments. Having cited Gannon

---

[4] At the time MCAD issued its decision in this case, its regulations were silent about what, if any, actions a party should take when a relevant court decision is issued during the pendency of a full commission review. See 804 Code Mass. Regs. § 1.23 (2019). The regulations have since been updated to specify that parties may advise the commission by letter of any pertinent and significant authorities that come to their attention. See 804 Code Mass. Regs. § 1.23(4) (2020).

9

in its decision for the proposition that "the employer must make an individualized factual inquiry into the employee's work and medical history in order to determine whether the employee would pose an unacceptably significant risk of serious injury to himself or others," MCAD cannot now claim that it was unaware of Gannon's potential relevance.[5]

2. Applicability of Gannon.  MCAD's main argument on appeal is that Gannon is inapplicable here because Madonna did not make a "qualified handicapped person" claim based on disparate treatment, but instead, a "failure to accommodate" claim.  Accordingly, MCAD states that the focus of its inquiry was not whether Madonna was qualified to perform details and overtime shifts, but whether the FRPD negotiated in good faith and provided Madonna with reasonable accommodations.  MCAD urges us to affirm on the ground that, despite the FRPD's attempts to negotiate in good faith, Madonna abandoned the interactive process required under MCAD guidelines when an employee seeks accommodations for a disability.  See generally Massachusetts Commission Against Discrimination, Guidelines:  Employment

---

[5] We note, however, that MCAD's characterization of Gannon as requiring the employer to determine the unacceptably significant risk issue appears to conflict with language in Gannon requiring the finder of fact in the discrimination case to decide that issue.  See Gannon, 476 Mass. at 797.

10

Discrimination on the Basis of Handicap, § VII (1998) ("MCAD Guidelines").  We decline to do so for several reasons.

First, the record does not support MCAD's assertion that it has always viewed this case exclusively through a failure to accommodate lens.  To the contrary, the hearing officer explicitly considered whether the denial of details and overtime shifts "constitute[d] disparate treatment based on handicap discrimination."  And, if MCAD considered Gannon inapplicable, it is puzzling that MCAD did not say so when citing Gannon in its decision.

More fundamentally, however, neither the hearing officer nor MCAD articulated the good faith negotiation standard anywhere in their respective decisions.  Nor did the hearing officer make any findings of fact about the parties' interactive process, let alone any conclusions of law based on Madonna's supposed abandonment of the process.  Because MCAD did not rely on the abandonment rationale below, neither may we rely on it to affirm MCAD's decision.  See Doe, Sex Offender Registry Bd. No. 58574 v. Sex Offender Registry Bd., 98 Mass. App. Ct. 307, 313 (2020), quoting Department of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1909 (2020) ("The basic rule

11

. . . is clear:  An agency must defend its actions based on the reasons it gave when it acted").[6]

Second, regardless of which framework MCAD applied to Madonna's case, it has not sufficiently explained why it did not apply the Gannon standard.  In particular, having received Madonna's appeal arguing that the hearing officer should have applied the "direct threat" standard, and knowing that standard had been superseded by Gannon, as evidenced by its citation to the new standard in its decision, it was incumbent on the full commission to explain what standard applied to Madonna's case and then how it was applying that standard to the facts found by the hearing officer.  See Retirement Bd. of Somerville v. Contributory Retirement Appeal Bd., 38 Mass. App. Ct. 673, 678 (1995), quoting G. L. c. 30A, § 11 (8) (agency decision "shall be accompanied by a statement of reasons for the decision, including determination of each issue of fact or law necessary to the decision").  The commission seemed to acknowledge that Gannon was relevant, yet it did not determine (1) whether the FRPD actually conducted "an individualized factual inquiry based

---

[6] For a related reason, we decline to affirm on the basis supplied by the judge.  A reviewing court may "not 'supply a reasoned basis for the agency's action that the agency itself has not given'" (citation omitted).  Costello v. Department of Pub. Utils., 391 Mass. 527, 536 (1984).  As discussed supra, the judge ruled for MCAD based on the absence of any adverse employment action, yet neither the hearing officer nor MCAD had ruled on that basis.

12

on substantial information regarding the employee's individual work and medical history" (quotation and citation omitted), Gannon, 476 Mass. at 799-800; (2) whether the FRPD presented sufficient evidence that Madonna "would pose an unacceptably significant risk of serious injury to [himself] or others," id. at 799; or (3) if the FRPD had done so, then whether Madonna could in fact "safely perform" details and overtime shifts. Id. We are left only with MCAD's conclusion that the FRPD's concerns were "legitimate" and "justified," without any definite statement of how that resolved Madonna's claim.

Third, we are unpersuaded by MCAD's assertion in its brief that, viewing this as a failure to accommodate case, Gannon does not apply. Under MCAD's own guidelines, a "reasonable accommodation" is "any adjustment or modification to a job [or] employment practice . . . that makes it possible for a handicapped individual to perform the essential functions of the position involved and to enjoy equal terms, conditions and benefits of employment" (emphasis added). MCAD Guidelines, § II(C). The opportunity to earn extra compensation through details and overtime shifts would appear to be a term, condition, or benefit of employment as a police officer. Cf. Yee v. Massachusetts State Police, 481 Mass. 290, 297 (2019) (denial of desired opportunity to earn extra compensation can constitute adverse employment action). Where, as here, the

13

employer defends its decision not to extend a term, condition, or benefit to an employee based on the employee's disability status and what the employer believes to be a resulting threat to the safety of the employee or others, the principles underlying Gannon would appear relevant in analyzing whether the overall accommodation offered by the employer is "reasonable."

Although Madonna asks us to apply Gannon and order a finding in his favor on liability, we think it preferable that MCAD determine the issues presented by Madonna in the first instance.  See Doe, Sex Offender Registry Bd. No. 11204 v. Sex Offender Registry Bd., 97 Mass. App. Ct. 564, 576 (2020).  To that end, we vacate the judgment and order the entry of a new judgment remanding the matter to MCAD for reconsideration and any necessary further proceedings, which may include the taking of additional evidence before a hearing officer.[7]

So ordered.

By the Court (Sacks, Grant & Smyth, JJ.[8]),

Joseph F. Stanton

Clerk

Entered: September 12, 2023.

---

[7] As we do not rule in favor of Madonna on his underlying claim, we deny his request for attorney's fees under G. L. c. 151B, §§ 5 & 9.

[8] The panelists are listed in order of seniority.